# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| TEMPLE BAPTIST CHURCH; *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> CITY OF GREENVILLE, *et al.*, ) <br> ) <br> Defendants. ) <br> _____) | Case No. 4:20-cv-64-DMB-JMV |

**THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFFS**

The United States of America respectfully files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." The United States also enforces 34 U.S.C. § 12601, which allows the United States to bring suit when law enforcement officers engage in a pattern or practice that deprives individuals of their federal constitutional or statutory rights.

The United States has a substantial interest in the preservation of its citizens' fundamental right to the free exercise of religion, expressly protected by the First Amendment. To that end, the United States regularly files statements of interest and amicus briefs on important issues of religious liberty in courts at every level, from trial courts to the Supreme Court of the United States. In addition, the Attorney General has issued comprehensive guidance interpreting religious-liberty protections available under the United States Constitution and federal law. *Federal Law Protections for Religious Liberty*, 82 Fed. Reg. 49668 (Oct. 6, 2017) (hereinafter "Attorney General Guidelines"). As relevant here, the Attorney General Guidelines explain that "although government generally may subject religious persons and organizations to

1

neutral generally applicable laws," government cannot "apply such laws in a discriminatory way" or otherwise "target persons or individuals because of their religion." *Id.* at 49669.

Especially in the midst of the COVID-19 pandemic, the United States has a strong interest in ensuring the development and maintenance of the best possible public health strategies to combat the virus and protect the people of the United States from harm. This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting public health and safety from COVID-19 and citizens' fundamental right to free exercise of religion.

## INTRODUCTION[1]

This suit is brought by Temple Baptist Church, a church in Greenville, and its Pastor, Arthur Scott (collectively, the "church") against the City of Greenville and its mayor (collectively, the "city") alleging that the city has taken improper action to stop it from holding drive-in church services in response to the COVID-19 virus. The church broadcasts its service over a low-power FM station for its parishioners who gather in their cars in the church's parking lot. ECF 1, ¶ 24. Attendees are required to remain in their cars at all times with their windows rolled up. *Id.* ¶¶ 1, 27. The church does not have a website or the ability to stream services online, and "many church members do not have social media accounts, the ability to participate in a Zoom call, or watch services online." *Id.* ¶ 23.

The Mississippi governor has designated churches and other religious entities as an "essential business or operation" that can operate so long as they adhere to Centers for Disease Control and Prevention (CDC) and Mississippi Department of Health guidelines. *Id*. ¶¶ 35-42. On April 7, 2020, however, the city issued an order titled "Executive Order Regarding Church

---

[1] The United States submits this brief on the basis of the facts alleged in the complaint.

2

Services" that barred churches from holding in-person or drive-in services until the Governor's shelter in place order is lifted. *Id.* ¶ 44. On April 8, the city dispatched eight uniformed police officers to the church. *Id.* ¶ 52-53. "[N]o one was outside his or her car at any point during the service, including when the City police arrived" and those "attending the service were sitting peacefully inside their cars listening to Pastor Scott's sermon, with their windows rolled up." *Id.* ¶54-55. The police then "began knocking on car windows, demanding driver's licenses, and writing citations with $500 fines." *Id.* ¶ 56.

The church filed this suit in response, raising claims under, *inter alia*, the Free Exercise Clause, and under the Mississippi Religious Freedom Restoration Act (MRFRA), MISS. CODE ANN. § 11-61-1(5) (2020).

**ARGUMENT**

**I. Constitutional Rights Are Preserved During a Public Health Crisis**

The federal government, the District of Columbia and all 50 states have declared a state of emergency and have taken unprecedented, but essential, steps to contain the spread of the novel coronavirus, and consequences of the life-threatening COVID-19 pandemic. *See*, *e.g.*, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020).[2] The President has issued "Coronavirus Guidelines for America" which, among other measures, urge the public to "follow the directions of [their] state and local authorities," to "avoid social gatherings in groups of more than 10 people" and to "use drive-thru, pickup, or delivery options" instead

---

[2] Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/

of "eating or drinking at bars, restaurants, and food courts."[3] The CDC has recommended that individuals "[s]tay home as much as possible" and when in public keep "about 6 feet" away from others.[4] States and localities have imposed a variety of measures, including mandatory limitations on gatherings. Observing these guidelines is the best path to swiftly ending COVID-19's profound disruptions to our national life and resuming the normal economic life of our country. Citizens who seek to do otherwise are not merely assuming risk with respect to themselves, but are exposing others to the same danger. It is for that reason that state and local governments have acted to protect public health by restricting in-person assemblies, including religious assemblies.

There is no pandemic exception, however, to the fundamental liberties the Constitution safeguards. Indeed, "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, --- F.3d ---, 2020 WL 1685929, at *6 (5th Cir. Apr. 7, 2020). These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always in force and restrain government action.

At the same time, the Constitution does not hobble government from taking necessary, temporary measures to meet a genuine emergency. According to the Supreme Court, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905).

---

[3] Coronavirus Guidelines for America (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf
[4] Centers for Disease Control, How to Protect Yourself and Others (April 8, 2020) https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html

The "settled rule [from *Jacobson*]," the Fifth Circuit recently explained, "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *In re Abbott*, 2020 WL 1685929, at *6. And, critically, "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Emergency public health measures such as gathering limitations and social distancing requirements in response to COVID-19 are evaluated under the Supreme Court's decision in *Jacobson.* Courts owe substantial deference to government actions, particularly when exercised by states and localities under their police powers during a bona fide emergency.

> Nevertheless, the Supreme Court has instructed courts to intervene:
>
> [I]f a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, *beyond all question*, *a plain, palpable invasion of rights secured by the fundamental law*.

*Jacobson*, 197 U.S. at 31 (emphasis added). As a result, government can take extraordinary, temporary measures to protect the public. In *Jacobson*, the Court explained, by way of example, that "[a]n American citizen arriving at an American port" who had traveled to a region with yellow fever "may yet, in some circumstances, be held in quarantine against his will." *Id.* at 29.

If, however, the record establishes "beyond all question, a plain, palpable" violation of the foregoing principles, then a court must grant relief. *See In re Abbott*, 2020 WL 1685929, at *7. Courts reviewing a challenge to a measure responding to the "society-threatening epidemic" of COVID-19 should be vigilant to protect against clear invasions of constitutional rights while ensuring they do "not second-guess the wisdom or efficacy of the measures" enacted by the democratic branches of government, on the advice of public health experts. *Id.*

## II. The Free Exercise Clause Prohibits Unequal Treatment of Religious Individuals and Organizations

**A.** The Free Exercise Clause guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Empl't Div. v. Smith*, 494 U.S. 872, 877 (1990). It also protects their right to act on these beliefs, through gathering for public worship as in this case, or through other acts of religious exercise in their daily lives. While the protections for actions based on one's religion are not absolute, *id.* at 878-79, among the most basic requirements of the Free Exercise Clause are that government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

To determine whether a law impermissibly targets religious believers or their practices, the Supreme Court has directed courts to "survey meticulously" the text and operation of a challenged law to ensure that it is neutral and of general applicability. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). The Court explained: "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

Under the Free Exercise Clause, a law or rule, or the application of a law or rule, that is not both neutral and generally applicable is subject to heightened scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.

A law or rule is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; visits "gratuitous restrictions on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533-35, 538 (internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. In short, "[t]he Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Church of the Lukumi Babalu Aye*, 508 U.S. at 534).

A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief,' including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does the prohibited conduct." *Church of the Lukumi Babalu Aye*, 508 U.S. at 534; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

Accordingly, the Supreme Court's free exercise decisions instruct this Court to "survey meticulously," *id.* at 534, the risks and character of the various essential services that the city continues to permit. The Court must determine whether the city's distinctions between nonreligious essential services and religious essential services are truly neutral and generally applicable. In other words, the Court must ensure that like things are treated as like, and that religious organizations are not singled out for unequal treatment. *See id.* at 533-34.

7

If the Court determines that the city's prohibition on drive-in church services is in fact not the result of the application of a generally applicable and neutral law or rule, then it must review the city's justifications and determine if the city has demonstrated a compelling governmental interest, pursued through the least restrictive means. *See id.* at 546.

The Court must be appropriately deferential to the expertise of public health officials in evaluating potential distinctions between a drive-in church and other permitted essential activities where people gather in cars, parking lots, or interact in some way in significant numbers. *See Jacobson*, 197 U.S. at 31; *In re Abbott*, 2020 WL 1685929, at *7. But such deference will not justify action that is "beyond all question, a plain, palpable" violation of free exercise principles. *Jacobson*, 197 U.S. at 31; *see also In re Abbott*, 2020 WL 1685929, at *7. Thus, if the Court determines that the city's prohibition is not in fact the result of a neutral and generally applicable law or rule, then the Court may sustain it only if the city establishes that its action is the least restrictive means of achieving a compelling governmental interest. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546.

**B.** The allegations in the complaint strongly suggest that the city's prohibition of drive-in church services, despite the inclusion of measures to reduce risk such as requiring people to remain in their cars, are neither neutral nor generally applicable.

Take neutrality first. According to the city, "ALL businesses and industries deemed essential by state and federal orders" may continue operations, ECF 1, ¶ 45, and the state has designated churches such as the one here as essential. Nevertheless, the city barred the church from holding services even if the church adheres to CDC and Mississippi COVID-19 guidelines for essential operations. *See id.* ¶¶ 33, 35. These allegations suggest that the city singled out

churches for distinctive treatment not imposed on other entities the state has designated as essential services.

In addition to appearing non-neutral, the church's allegations also tend to show that the city's emergency actions are not applied in a generally applicable manner. The church alleges facts tending to show that conduct is being permitted for various secular reasons when equivalent conduct is being forbidden to churches holding drive-in services. Notably, the city appears to permit citizens to sit in a "car at a drive-in restaurant with [their] windows rolled *down*," but not "at a drive-in church service with [their] windows rolled *up*." *Id*. ¶ 51. The church thus alleges that the city has "fail[ed] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree," *Church of the Lukumi Babalu Aye*, 508 U.S. at 543, than drive-in services like the church's here.

### III. The Compelling Interest/Least Restrictive Means Test Is a Searching Inquiry

The Court should apply heightened scrutiny under the Free Exercise Clause if it determines, after applying appropriate deference to local officials, that the church has been treated by the city in a non-neutral and non-generally applicable manner. The same analysis would apply if the Court found that the church's religious exercise has been burdened under the Mississippi Religious Freedom Restoration Act, MISS. CODE ANN. § 11-61-1(5)(b) ("Mississippi RFRA"). The federal Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb, which applies to federal action (but not state and local government action) "prohibits the Government from substantially burdening a person's exercise of religion . . . unless the Government demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 695 (2014)

9

(citations and internal marks omitted). This is true "even if the burden results from a rule of general applicability," *O Centro Espirita Beneficente Uniao do Vegetal v. Gonzales,* 546 U.S. 418, 424 (2006). Mississippi's RFRA similarly states that the government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (i) is in furtherance of a compelling governmental interest; and (ii) is the least restrictive means of furthering that compelling governmental interest." MISS. CODE ANN. § 11-61-1(5)(b). This is a difficult standard to meet.

As a general matter, prohibiting large gatherings to prevent the spread of COVID-19 undeniably advances a compelling government interest. The Fifth Circuit recently recognized "the escalating spread of COVID-19, and the state's critical interest in protecting the public health." *In re Abbott*, 2020 WL 1685929, at *1. However, that is not the end of the inquiry. In *O Centro*, the Supreme Court considered under the federal RFRA whether banning a religious group from using a particular controlled substance in its worship service was supported by the compelling interest of enforcing the drug laws. *See* 546 U.S. at 428-39. The Court recognized that while enforcing the drug laws constitutes a compelling interest as a general matter, the government had to show more—a compelling interest in applying those laws to the small religious group that sought to use a drug in religious ceremonies that was not a sought-after recreational drug and thus not prone to diversion. Drawing on its Free Exercise Clause precedents, the Supreme Court held that courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431.

The Supreme Court has noted that "'context matters' in applying the compelling interest test, and has emphasized that strict scrutiny's fundamental purpose is to take 'relevant

10

differences' into account." *Id.* (citations omitted). For example, in *Cutter v. Wilkinson*, the Supreme Court applied the compelling interest standard in a manner that directed that prison administrators be afforded deference on what constitutes safety and good order. 544 U.S. 709, 723 (2005). Similarly, here, a court must apply this standard in the context of a pandemic that officials have predicted—if unchecked—could claim a significant number of American lives. On the other hand, the requirement set forth in *O Centro* that a compelling interest must be evaluated in context rather than by reference to a broad general principle such as health or safety, and the related requirement that the government must use the least restrictive means to achieve its interest, *see Hobby Lobby*, 573 U.S. at 728 (the "least-restrictive-means standard is exceptionally demanding"), emphasize that a court must engage in a searching inquiry.

The question for this Court, then, is whether the city's alleged actions here—namely, "reclassif[ying] churches as '*non*-essential'" businesses and operations so as to prevent this church from engaging in its "'drive-in' services [that] involve no in-person contact," ECF 1, ¶¶ 24, 45—furthers a compelling interest, and whether there is no less restrictive measure the city could use to achieve that interest while allowing the church to hold its services. If in this fact-intensive and context-laden analysis, the court determines that there are no "relevant differences," *O Centro*, 546 U.S. at 420, with regard to the efficacy in containing COVID-19 between what the church proposed and what the city would require, then the city's measure must yield to the church's sincerely held religious exercise.

The facts alleged in the church's complaint strongly suggest that there are no such differences and that the city should allow the church to hold its drive-in services. Under strict scrutiny, the city has the burden to demonstrate that prohibiting the small church here from holding the drive-in services at issue here—services where attendees are required to remain in

their cars in the church parking lot at all times with their windows rolled up and spaced consistent with CDC guidelines—is the least restrictive means of furthering a compelling interest. As of now, it seems unlikely that the city will be able to carry that burden. Again, according to the complaint, the church "does not allow those attending its 'drive-in' services' to leave their cars for any reason," ECF 1, ¶ 5, and requires them to space their cars "beyond CDC guidelines," with their "windows up," *id.* ¶¶ 1, 24. Based on those allegations, it is unclear why prohibiting these services is the least restrictive means of protecting public health, especially if, as alleged in the complaint, the city allows other conduct that would appear to pose an equal—if not greater—risks, *see id*. ¶ 51.

## CONCLUSION

The United States respectfully requests the Court to consider the arguments set forth above in evaluating this case. The facts alleged in the complaint strongly suggest that the city's actions target religious conduct. If proven, these facts establish a free exercise violation unless the city demonstrates that its actions are neutral and apply generally to nonreligious and religious institutions or satisfies the demanding strict scrutiny standard.

Dated: April 14, 2020

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

/s/ William C. Lamar
WILLIAM C. LAMAR (MSB #8479)
United States Attorney
Northern District of Mississippi
900 Jefferson Ave.,
Oxford, MS 38655
Phone: (662)234-3351
Email: Chad.Lamar@usdoj.gov

ALEXANDER V. MAUGERI
Deputy Assistant Attorney General

/s/ Eric W. Treene
ERIC W. TREENE
Special Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone: (202) 514-2228
Email: Eric.Treene@usdoj.gov

D. MICHAEL HURST, JR.
United States Attorney
Southern District of Mississippi
501 E. Court St.
Suite 4.430
Jackson, MS 39201

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that this 14th day of April 2020, the foregoing United States' Statement of Interest was electronically filed with the Clerk of Court using the CM-ECF system, which will send a notice of electronic filing to all counsel of record.

          /s/ William C. Lamar     
          WILLIAM C. LAMAR